**In re James H. INGERSOLL, Jr., Debtor.**

**Donald D. KRISEMAN, Plaintiff,**

v.

**James H. INGERSOLL, Jr., Defendant.**

**Bankruptcy No. 88–1096–8P7.**

**Adv. No. 88–204.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 5, 1989.

Jay B. Verona, St. Petersburg, Fla., for plaintiff.

Russell M. Blain, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS is a Chapter 7 liquidation case and the matter under consideration involves a challenge to James H. Ingersoll, Jr's. (Debtor), right to a general discharge in bankruptcy. The Second Amended Complaint filed by Donald D. Kriseman (Plaintiff) objects to the Debtor's discharge based upon § 727(a)(2)(A) of the Bankruptcy Code and alleges that the Debtor transferred property within one year before the date of the filing of the Petition with the intent to hinder, delay or defraud the creditors. Count II of the Plaintiff's Second Amended Complaint asserts a claim for relief based on § 727(a)(4)(A) of the Bankruptcy Code and alleges that the Debtor knowingly and fraudulently made a false oath in connection with this case. The assets which are involved in the allegations contained in the Complaint are as follows:

A 1979 Lincoln Towncar

Certain real property located in Frankfort, Benzie County, Michigan, known as the Crystal Downs property, Lots 131, 132 and 133

80 shares of stock in Hinchliff Corporation

A condominium unit located in Clearwater Beach, Pinellas County, Florida known as Unit 2006, Lighthouse Towers

Ownership interest in a real estate project known as Highland Shores

At the duly scheduled evidentiary hearing, the Court denied a Motion to Amend the Complaint to add an allegation of concealment, but deferred ruling as to a false oath claim for certain items of personal property, which was not plead in the Amended Complaint. The facts as established at the final evidentiary hearing are as follows:

The Debtor graduated with a bachelor's degree and a major in economics from Dartmouth College in 1968. In 1971 he received a master's degree in business administration from the University of Chicago. Upon graduation, the Debtor was employed by Sears, Roebuck & Company and worked at various positions until he reached the level of assistant buyer. After leaving Sears, Roebuck and Company, the Debtor became involved in a variety of investments. One was known as IQ Interests, Inc., which was primarily an investing and consulting business which included real estate investing and financial consulting.

The Debtor became acquainted with the Plaintiff in 1980 when the Debtor, in conjunction with John Quinnert, and Mr. Middendorf and James H. Ingersoll, Sr., the Debtor's father, purchased the stock of a company known as Modern Wholesale Hardware, Inc., in Pinellas County, Florida. The Debtor executed a personal guarantee payment to the Plaintiff for a lease agreement, a consulting agreement and a prom-

issory note incident to the purchase and sale of Modern Wholesale Hardware, Inc.

In addition to Modern Wholesale Hardware, Inc., the Debtor became involved with several building supply businesses known as Modern Wholesale Hardware of Delaware, Inc., Modern Steel Door, Inc., R & K Specialties, Inc., and Illum–a–Lite, Inc. (Plaintiff's Exh. No. 7).

In 1982 the Debtor's father, Mr. Ingersoll, Sr., a retired vice-president of International Sales for Borg–Warner Corporation became interested in making investments and formed a corporation known as Hinchliff Corporation. This business was and is involved in real estate investment and development (Plaintiff's Exh. No. 20). Of the total issued stock of Hinchliff, 920 shares were issued to Mr. Ingersoll, Sr., and 80 shares were issued to the Debtor. The assets of this corporation eventually included the Highland Shores project, a condominium unit in a development known as Lighthouse Towers and a real estate development known as Warwick Shores owned by a venture known as J–4 Enterprises in which Hinchliff held a 50% interest. Although Mr. Ingersoll, Sr., was a shareholder in Modern Wholesale, he did not actively participate in the operation of the business. However, he loaned approximately $500,000 in 1983 and 1984, and $225,000 in 1985 to the Debtor and/or to Modern Wholesale through the Hinchliff Corporation.

In November of 1983, the Debtor and his father, attended a meeting at the office of their accountant, Anthony Clesceri, apparently on the advice of the accountant, following which the Debtor agreed to transfer shares in Hinchliff to his father, as well as both the Debtor's and his wife's interest in property known as Crystal Downs. Mr. Ingersoll, Sr., having other children, was concerned that he had unfairly benefitted the Debtor to the detriment of his other children and therefore wanted to equalize the distribution of his estate. The agreement was reduced to writing (Plaintiff's Exh. No. 21). Although it is unclear when the transfer of the Hinchliff shares actually took place, it is apparent that the trans-

fer occurred sometime in 1983 or 1984 and that the 1984, 1985, 1986 and 1987 tax returns for Hinchliff reflect Mr. Ingersoll, Sr., was 100% owner of the Hinchliff stock. (Debtor's Exh. No. 5.)

On November 28, 1984, the Debtor submitted a financial statement to First National Bank of Clearwater in which he listed his shares in Hinchliff Corporation as being worth $400,000 and an ownership interest in a 1979 Lincoln towncar valued at $6,000. (Plaintiff's Exh. No. 10.)

It is clear that on or about October 3, 1984, the Debtor's father transferred title to a 1979 Lincoln towncar to the Debtor (Plaintiff's Exh. No. 12) and that in his application for certification of title and/or vehicle registration and motor vehicles sales and use tax report, the Debtor described the transaction as "gift (no unpaid balance assumed)" in connection with the acquisition of the Lincoln towncar. (Plaintiff's Exh. No. 12.) Further, on October 23, 1984, the state of Florida issued a certificate of title for the Lincoln towncar showing the Debtor as the owner of the vehicle. (Plaintiff's Exh. No. 12.) It is undisputed that from October 23, 1984, through and including the date of the filing of his bankruptcy Petition, the Debtor had uninterrupted use and possession of the automobile, as well as having the title in his name. The Debtor drove the automobile to and from work every day, parked it at his home at night and used it for travel as well as using it for running personal errands. It appears that the Debtor and his non-debtor spouse had obtained title to a one-half interest in Lots 132 and 133 of the Crystal Downs property from various family members, including the Debtor's father and mother in 1975. (Plaintiff's Exh. No. 15.) The property known as Crystal Downs consists of three contiguous lots, Nos. 131, 132 and 133. A five-bedroom house sits entirely on Lots 132 and 133. Lot 131 is vacant. Title to a one-half interest in Lot 131 was obtained by the Debtor and his non-debtor spouse in 1982 (Plaintiff's Exh. No. 13.). As to Lots 132 and 133, the record title has remained in the Debtor's name until January 29, 1988, approximately 32 days before the filing of the

Debtor's bankruptcy Petition when a quitclaim deed was recorded pursuant to which the Debtor transferred his interest in Lots 132 and 133 to his father. (Plaintiff's Exh. No. 21a.) There is no indication that the Debtor's interest in Lot 131 has ever been transferred to this date. Incident to the Debtor's purchase of Lots 132 and 133 on or about June 1, 1975, the Debtor executed a $58,000 promissory note and mortgage securing the payment thereof. (Plaintiff's Exh. No. 16 and No. 17.) The promissory note required installment payments on June 1 and December 1 of each year until June 1, 1984, when the final payment became due. On November 28, 1984, the mortgage was satisfied. (Plaintiff's Exh. No. 16 and Plaintiff's Exh. 18.) Prior to January 1, 1984, the Debtor used the Crystal Downs property for approximately one month per year, primarily as a summer vacation home. It appears that after January 1, 1984, the Debtor continued to make payments under the promissory note given as part of Debtor's purchase of Lots 132 and 133 (Plaintiff's Exh. No. 16.) and that Debtor used the Crystal Downs property after January 1, 1984. Although Mr. Ingersoll, Sr., did visit the Crystal Downs property, it was only as a guest of his son and not as an owner and that he never considered himself an owner, even though he held the record title of the property. Mr. Ingersoll, Sr., has paid none of the maintenance expenses, taxes or insurance, or mortgage payments on the Crystal Downs property since the transfer on January 1, 1984. In 1986 and 1987 the Debtor claimed his deduction for payment of real estate taxes on the Crystal Downs property. (Plaintiff's Exh. Nos. 4 and 5) On January 1, 1984, the Debtor submitted a mortgage loan application to First National Bank of Clearwater, claiming an ownership interest in the Crystal Downs property and assigning a value of $200,000 to the property. On the Debtor's 1987 income tax return, he claimed a return on investments for that year in the amount of $19,900. A quitclaim deed whereby the Debtor allegedly transferred Lots 132 and 133 of the Crystal Downs property to his father was allegedly signed by the Debtor on Novem-

ber 1, 1985. (Plaintiff's Exh. No. 21a) It was prepared by an Illinois attorney, executed in Illinois, but is notarized by a Florida attorney. The deed was not recorded until January 29, 1988.

As to the property known as Unit # 2006, Lighthouse Towers Condominium, it appears that title to the condominium was vested in the Debtor as Trustee under the Hinchliff land trust. From February 28, 1984, through and including the filing of the Debtor's bankruptcy Petition, the Debtor was the beneficiary of the Hinchliff land trust (Plaintiff's Exh. No. 26).

On August 1, 1985, Modern Wholesale Hardware and four related companies filed voluntary Chapter 11 Petitions for Relief which were signed by the Debtor as president. (Plaintiff's Exh. No. 7.) On August 1, 1985, and August 15, 1985, respectively, Modern and the Debtor defaulted under the consulting agreement and lease agreement with the Plaintiff. (Plaintiff's Exh. No. 22.) Thereafter, the Plaintiffs sent the Debtor various notices of default and demands for payment of the financial obligations owing from the Debtor to the Plaintiff. On September 5, 1985, Plaintiff filed suit against the Debtor and others for breach of the lease agreement.

The Debtor filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code on February 29, 1988. On the Debtor's schedules and Statement of Affairs, he listed joint ownership with his non-Debtor spouse in a 1976 Buick station wagon (Plaintiff's Exh. No. 6) as the only automobile in which he had an interest. He also listed his homestead, but claimed no other interest in real property. On Item 12 of the Debtor's Statement of Financial Affairs, he disclosed the following: "In January 1984, I entered into a signed agreement with my father to transfer my interest in Hinchliff Corporation plus a security interest in real property owned by me and my wife (our share was 50%). In November 1985 my father was given a quitclaim deed for my interest in said real property for default under the original agreement. However, the quitclaim deed was not recorded until February 1988." In response

to the request to list all stocks and interest in unincorporated and incorporated companies, the Debtor answered, "None" (Plaintiff's Exh. No. 6.), notwithstanding the fact that on or about January 27, 1982, the Debtor was issued 80 shares of Hinchliff Corporation (Plaintiff's Exh. No. 20.)

Basically, the facts upon which the Plaintiff's claim that the Debtor's discharge should be denied are based upon § 727(a)(2)(A) and § 727(a)(4)(A) of the Bankruptcy Code which provide as follows:

§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or....

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account....

■ Provisions dealing with the discharge have been traditionally recognized to be remedial and, as such, have always been liberally construed in favor of the debtor and against persons challenging the debtor's right to discharge of the Bankruptcy Code. *In re Burke*, 83 B.R. 716 (Bkrtcy.N.D.1988). Thus, it is well established that the burden is on the objecting party to prove that a debtor should be denied a discharge by way of clear and convincing evidence. *In re Bernstein*, 78 B.R. 619 (S.D.Fla.1987).

■ In an adversary proceeding in which the plaintiff seeks to have the debtor's discharge revoked pursuant to § 727(a)(2) or § 727(a)(4), the burden of proof is on the plaintiff to establish actual intent by the debtor to hinder, delay, defraud creditor or the commission of a false oath. While the creditor is not required to illicit an actual admission of intent from the debtor. Actual intent may be inferred from the debtor's conduct or from the particular circumstances of the case. *In re Kaiser*, 94 B.R. 779 (S.D.Fla.1988). As to a § 727(a)(2)(A) claim, Plaintiff is required to prove the following elements: 1) that a transfer occurred; 2) that the property transferred was property of the estate; 3) that the transfer occurred within one year of the Petition; and 4) that at the time of the transfer the Debtor possessed a requisite intent to hinder, delay or defraud a creditor. *In re Ford*, 53 B.R. 444 (W.D.Va. 1984), *aff'd; Ford v. Poston*, 773 F.2d 52 (4th Cir.1985); *In re Clemons*, 42 B.R. 796 (Bkrtcy.S.D.Ohio 1984).

■ As to the property known as Crystal Downs, the Plaintiff alleges that the Debtor quitclaimed the property to his father in November of 1985 to hinder the Plaintiff in his lawsuit against the Debtor, which was filed in September of 1985. Although the Debtor testified that he intended to transfer his interest in Lots 132 and 133 to his father on January 1, 1984, he continued to use the property thereafter; he paid the real estate taxes and claimed the deduction for the payment of said real estate taxes, despite claiming that he held no ownership interest in the property. As to the claim that he did not know he could not claim a deduction for payment of real estate taxes unless he owned the property, the Debtor's lack of knowledge is simply not substantiated by his extensive education and career experience. Therefore, it is clear that the Debtor attempted the transfer in November of 1985, in light of the pending lawsuit against him. As to the rest of the world, however, the transfer was not effectuated until January 29, 1988, when the deed was recorded, thirty-two days prior to the filing of the Petition for Relief. This Court is satisfied that the Plaintiff has met his burden of proof that the Debtor transferred property within one year of the date of the filing of the Petition and that he had the requisite intent to hinder, delay or defraud the Plaintiff.

■ The Plaintiffs rely on § 727(a)(4)(A) as an additional ground upon which they allege that the Debtor's discharge should be denied for failure to list a 1979 Lincoln towncar as an asset on this Schedule B–2. The purpose of § 727(a)(4)(A) is to provide the trustee and creditors with reliable information, *In re Cutignola, supra; In re MacDonald,* 50 B.R. 255 (D.Mass.1985). Although the discharge may not be denied where the untruth was the result of mistake or inadvertence, failure to schedule assets of significant value raises a presumption of actual intent. *In re Gonzalez,* 92 B.R. 960 (Bkrtcy.S.D.Fla.1988).

■ All of the documents reflecting the alleged purchase of the vehicle by Hinchliff from the Debtor's father were executed prior to the transfer of title to the Debtor. Further, it should be noted that Fla.Stat. § 319.22 provides in pertinent part that no court shall recognize the right, title, claim or interest of any person in or to any motor vehicle unless evidenced by a certificate of title duly issued to that person in accordance with the provisions of this Chapter.

■ In defense, the Debtor asserts that he did schedule the vehicle in Item 6 of his Statement of Financial Affairs where he stated that the company car was the property he is holding for another person. It should be noted that responses furnished to questions on the Statement of Financial Affairs are not disclosures of an asset or assets that must be stated on the B–Schedules. While it is true that the discharge may not be denied where the untruth was the result of mistake or inadvertence, it is clear that the totality of the circumstances in this case indicate fraud.

Based upon the evidence presented, there can be no doubt that the Debtor intended to conceal his ownership of the car and his failure to list it on his schedules was a material omission. *In re Topping,* 84 B.R. 840 (M.D.Fla.1988) (The Court denied debtor's discharge for failure to list interest in a 1981 Buick on bankruptcy schedules where debtor maintained that title was placed in her name merely as a convenience.)

In either event, whether he fraudulently transferred the Crystal Downs property to his father within one year prior to the filing of the Petition for Relief, or whether he simply failed to disclose his ownership interest in the Lincoln towncar in his schedules and Statements of Affairs, the Debtor has forfeited his right to a discharge in bankruptcy.

In light of the foregoing, it is unnecessary for this Court to dwell on each and every transaction on which the Debtor is alleged to have committed a fraud. This Court is satisfied that the Debtor's actions in this case reflect a pattern of deception and deceit which is unrebutted. Accordingly, based on the foregoing, and the clear and convincing evidence upon which the Plaintiff has based his allegations, the Debtor's discharge will be denied pursuant to 11 U.S.C. § 727(a)(2) and (a)(4).

A separate Final Judgment will be entered in accordance with the foregoing.